Nick Klaver, Pro Bono Counsel for the Appellants in this case. This case addresses an immigration detention regime in which civil detainees who are accused of no crime and who are awaiting a removal hearing are transferred around the country often, as was the case here, to facilities thousands of miles away from home. Not only do the detainees and their U.S. citizen minor children have no opportunity to be heard on the impact of these transfers, but they deliberately are given no warning. What about the impact of the detentions? Your argument would lead to the notion that because the detention removes them from their families, they can't be detained. No, Your Honor, I don't think that's correct. Well, why don't you explain why? Sure. Because it seems to me, if they have authority to detain an alien, pending proceedings or I think the district court made a similar ruling that the two concepts are linked. I think as we stated in our complaint, the impact of the transfers is not de minimis when compared with the detention itself. I'm going to the right of detention. In other words, if the immigration authorities had one large detention site in the center of Kansas and it was a little village and they I think in the hypothetical where there was one single detention center thousands of miles away from the place of arrest, that may well implicate issues of family unity as to the individuals that are remote to that location. Is there some kind of statutory requirement or congressional requirement that a person being detained under the INA be detained in a particular location? No, Your Honor, we're not proceeding under a statutory mandate like that. You're basically saying that they can't detain them where they want to detain them because it will remove them from their family. Or vice versa, they have to detain them near their family. That's your argument. I think part of the issue to be considered here is the historical context. I use the term bizarre when compared with other contexts. For example, pretrial criminal detention. To have an individual arrested and then aside from instances of extradition where the person has jumped several states and are arrested. But you're not challenging the policy. They can detain them under normal detention. They can detain them anywhere they want, can't they? With respect, no, Your Honor. Well, that's what I'm asking. Where are the restrictions on where they can detain them? I think the elements of the due process analysis do constrain in several important respects. So you think a person who's being detained has a constitutional right to be detained in a particular location? I think under certain circumstances, yes. For example, one of those is these are civil detainees. So if these transfers are found to be punitive, either emotive or effect, then there's established case law that demonstrates that those are subject to a due process challenge. In addition, if indeed as we've shown in the complaint and as the amicus briefing in this case has demonstrated as well, the transfers themselves as opposed to the detention in the first instance implicates the family integrity and the family unity. Well, everyone does. Every single detention affects family unity. Just like every sentencing does in a criminal case. You send in somebody, you take them away from his family and put them in jail. And of course the government has an interest in detaining individuals it suspects are subject to removal. But here you have the additional issue of the transfers. And as the Supreme Court held in Vitek v. Jones, those are separate issues. That just because in Vitek the issue was somebody who was convicted was then transferred to a mental health facility, the government tried to make a similar argument to the one here that it's a de minimis transfer. The person's already been convicted. The court rejected that argument and said no, this is a change to the way to the facility and the type of detention that's going on here. And so we are going to review that under due process principles. Here I think it's amply stated both in the complaint that the transfer of issue here went from allowing the U.S. citizen minor children of the detainees to visit. Do you have any case that regulates homeland security in where a person can, who is subject to detention, where that person can be detained? Any case. Where that person can be detained, no. Does a detainee have a right, any kind of right, to regulate where he's being detained? No, but again, I think the relatively unique context of this type of- It's not unique. They were detained in Virginia and then they're transferred to Texas. But there are detention facilities there too. But my point is you're suggesting that the detainee has some constitutional right to not be separated from his family when he's in detention. And the first obvious question is he's already being deprived of contact with his family by the detention. But then the second question is even once he's in a detention center that's close to home, what gives him the right to say he can't be moved to another location for whatever reason the homeland security has for making that decision? It could be crowding issues. It could be facilities questions. It could be interaction questions with detainees and so forth. But for the courts to get involved in telling homeland security where they can detain somebody based on a detainee's allegation that he's being removed from his family or his family's being broken up by the detention, you're saying it's being broken up by the transfer. But that's just a question of degree. Well, I think it's a question of degree, but I think it's a question of fact too. I think a question of fact that, frankly, the district court overstepped the standard of review and a motion to dismiss to affirmatively find. Well, tell me what the liberty interest is here. The liberty interest is in maintaining family integrity, as is borne out in the Troxel line of cases, Moore v. City of East Cleveland, that dealt with the rights of family members to cohabitate with one another. That is a well-worn liberty interest that's been— Does that mean that a member of the family can't be detained, does it, under the Constitution? No, certainly, as I said before, certainly the government has an interest in detaining individuals who are subject to— Well, that interferes with that right you just said. You said the right that you are arguing is for family members to cohabitate together. The question is whether these transfers create such an additional impact on that right that they implicate— The first detention broke it entirely. They don't cohabitate together. Your Honor, with respect, I disagree that it broke it entirely. I think as was pled in the complaint, the appellant U.S. citizen minor children were able to visit their fathers that were in detention. So is your argument that it's the visitation rights that are being impaired? In a sense, yes, the ability to have in-person contact. You don't really allege that, but the question is now, does that rise to a constitutional right? In other words, does the right of family integrity entitle family members to visit detainees? Yes, it does. When the lack of in-person contact, as was discussed, the effects of which were discussed in the complaint, alleged in the complaint, and addressed by the amicus briefing in this case. When they create lasting issues that get to the heart of family integrity, you can look in the care amicus brief on the examples of Alicia and Camilo that had difficulties integrating back with their family afterwards. These have ripple effect reverberations that go to the heart of a family's ability to move on. Is there any limitation to your principle? I think we've got probably a liberty interest problem here too, but I'm also sort of odd to me. The suggestion is that if there's any burden on a family to visit in person with their family member, that that's a violation of the right. And you say, well, I want to limit that to state lines. Seems to be the line you're trying to draw, right? But why do state lines matter? So if you're in Texas and you happen to be in North Texas, it could be closer to be in Oklahoma than it is in El Paso. And so why does state lines matter? And then secondarily, in sort of answering that, doesn't your theory also lead to this conclusion that any time a family can say, well, yes, this is in the same town, but I don't have a car. And public transportation is not available from where I live, and so I can't get there. So any time they can just claim it's hard for me to get there, maybe financially, maybe otherwise, that your theory would suggest, well, they have a liberty interest now in being transferred down to the local jail, or they need to maybe put them on house arrest so that they can get right over there immediately. There doesn't seem to be any limitation on your principle. To be clear, there are limitations. And the transfers in this case happen to run across multiple state lines. But I will acknowledge that there are certainly instances where an interstate transfer would not give rise to implicate liberty interests and family unity. Are you making this up as you're going along, or are these principles that you're getting from cases? No, Your Honor. I mean, how do we decide when you can go across a state line or when you can't? How many miles are you talking about? How much financial burden are we talking about? In other words, you almost have to articulate it to fit your own case and then to try to serve the right, and that's not real principle. What it boils down to is does the transfer ultimately actually implicate issues of family unity? Well, everyone will. Every single transfer will. How about if you transfer from Virginia to West Virginia? Morgantown or someplace where they have a facility maybe, and they say, we've run out of room in Virginia, we're going to put them in West Virginia. Violate the Constitution? A detainee can certainly say that, but if they're given a notice, an opportunity to be heard, we're not suggesting, by the way, that Why do they have a right to be heard? Are these decisions that the detainee participates in? I don't want to go to that facility because that facility is out of the way, or they don't have good showers there, or the reputation for the food is terrible there. I want to go to this other facility. Well, on those issues, they're civil detainees, so if they can make a case that it's a punitive measure, then they should have notice and opportunity to be heard on those issues. I think that's clear from the Supreme Court case law on punitive detention. On this particular issue of family unity rights, I think there are instances where somebody living in Northern Virginia, if they're transferred from Farmville to Maryland, may welcome that, and certainly are unlikely to be able to make any kind of showing that it implicates their family unity. On the other hand, you can envision scenarios that are intrastate in Alaska or another large state that may well implicate family unity issues. Does this cover cousins too? Third cousins? Friends? Close friends? Do they have that right? Are they part of the family? I think there would need to be a showing of true family integrity implications. But it would include spouses, parents, maybe brothers and sisters. In essence, what it would mean, because almost everybody, maybe there's a hermit that doesn't apply, but in your world, literally everybody that has a family member would have this new process that's set up for them to determine how far is too far. Can you move them from Spartanburg in South Carolina down to Charleston, or can you only move them to Columbia from Spartanburg? Maybe that's too far. How about Greenville and Spartanburg? Maybe that's close enough that courts are then in the business of trying to determine whether Greenville's close enough, but Charleston's too far for anybody who has a family member. I don't think, certainly not in the first instance. Where are you getting the authority for that, to say that? In other words, the question is, we're looking for the principles and the cases. And as you answer these questions, you're making judgment calls that say, well, Spartanburg and Greenville are close enough together, that wouldn't be a problem. But maybe Charleston might be a problem, because that's really far. Your Honor, I'm not personally making any judgment calls. Then what's the principle you'd make? It's within the government's discretion to craft some form of notice, an opportunity to be heard that complies with the due process here. That would be in every single case then. In other words, any time somebody detains somebody, they would have to have a hearing and say, we plan to detain you in Kentucky. That's a facility we've selected. Do you have any objections? Is that what you're asking? No, Your Honor. With respect, what we're asking for is, and I think this is set forth in D.B. v. Cardle, that— No, I'd just like to know the principle you're asserting. Yeah. If you said the person affected, the family member affected, has a right to due process, that means a hearing? As D.B. v. Cardle indicated— Could you just answer my question and not go to the case? Tell me what is the principle you're advocating? Does a person, any person who has a relative being detained, have a right to have a hearing? No, not necessarily. If there would have to be some kind of showing, and right now there frankly is none, as I understand it, the government does not even take in the information necessary to make this determination. But there would need to be some showing that the transfer at issue implicates the family unity rights. There may be a case where there's no family in the area. There may be a case where there is family, but there's no relationship implicated. There are numerous instances where there would be no implication to the family unity rights involved. And in D.B. v. Cardle, this court explained that minimally the complaining party received notice of the reasons for the deprivation of the right, an explanation of the evidence against him, and an opportunity to present his side of the story. Minimally, that's it. We're not talking about full-blown hearings. And in this case, there were 150 people who were transferred at the same time, right? Right. And so your theory would say that for that transfer, whether they were moving across the state, between states, or across the country, that they were going to be required to have individual hearings for every person before they move every single time. No, Your Honor. Well, excuse me. Every person who has a family member, which I'm going to assume is the vast majority of the 150 people, but maybe it's not all of them. Maybe some of them, all their family members have died. But otherwise, all of the people that have a family member, they get an individualized hearing that you've described. I don't think an individualized hearing is necessary. Again, notice and opportunity to be heard does not necessarily rise to the level of a full-blown hearing. It could be a situation where— What does that mean, notice and opportunity to be heard? I think in this context, it could mean the government takes in information on the family ties to a given area, makes a determination, and perhaps in writing gives the individual an opportunity to object to that decision. But right now, there is no opportunity whatsoever. Do you have a case anywhere of any kind that supports the notion that a person has a right to determine the location of his detention? Under any ground? I think there are certainly cases that discuss punitive measures that are taken in the context of transfers. I think there are also cases that deal with interstate— I'm talking about—let's confine it a little bit based on family separation. Any case? No, but again, if it rises to the level of either a punitive measure or an issue that implicates the family unity rights under established case law, then it would give rise to— Do you have a case where there is a challenge to detention based on family rights? No, but again, the historical— It seems to me every single detention in the United States affects family relation rights. I mean, I'm talking about criminal, civil, any kind of detention. And that's a reason why— There's not a single case. A reason why that hasn't bubbled up in these other contexts that you describe is because this is a bizarre outcome relative to those other contexts. All right. Thank you, Your Honor. Yeah, thank you. Mr. Kirk. Good morning, Your Honors. May it please the Court.  No court has jurisdiction over this case because a federal statute specifies that the Secretary of Homeland Security holds discretion to determine the facilities at which aliens are detained during their removal proceedings. Well, rather than drag this out, the argument comes down to if we agree to have discretion, that doesn't answer the question. The question is whether the statute specifies that we don't have—that it's discretionary. And it seems to me there may or may not be a distinction, but some cases have suggested there is. And I don't know why you want to pound that one when we're talking about a constitutional right of a detainee to determine where he's going to be detained or transferred. It's unprecedented at this point. Well, Your Honor, yes. I'll move on to the merits then very quickly. But I'll just note that the substantive statute at issue, AUSC Section 1231G1, contains the word appropriate, which has long been understood to connote discretionary authority. Well, what if we agree with you?  In other words, the jurisdiction stripping said—uses the word specify in the statutory provision. And the INA uses specify what, over 30 times with respect. But they don't with respect to the discretion conferred here. Does that make a difference? No, Your Honor. A statute need not contain the word discretion or discretionary to specify discretionary authority. No, I'm talking about—yes. Oh, you think— The word appropriate specifies discretionary authority. The word discretion or discretionary is not necessary. The Sixth, Seventh, Eighth, and Tenth Circuits all have applied Section 1252A2B2 to statutes that did not contain the word discretion or discretionary. In the Szilagyi case, for example, the Sixth Circuit applied the statute to a substantive provision that not only didn't contain the word discretion or the word discretionary, but also that didn't even contain the word appropriate or the word may or any other word that has been thought to connote discretionary power. Answer the other question. So one—I get there's the one question about is this discretionary. And the use of the word appropriate is a sufficient word. I understand that argument. The real argument that your colleague seems to make against you, though, is that this isn't about where individuals are housed. This is about the bricks and mortar. So when we read this statute, right, the statute that we're referring to, the Attorney General shall arrange for appropriate places of detention, right, for aliens, right? So it's describing bricks and mortar, not where an individual goes. And the Fourth Circuit recognized implicitly there's discretion of where an individual goes. But this statute, what it's really specifying is not where a person is housed, but the bricks and mortar. Like, you can go build them. You can buy them. You can do all those things. And that's what needs to be appropriate. It's the bricks and mortars, not the individual decisions. Your Honor, both things are true. The statute confers authority on the Secretary to determine or define appropriate places of detention, the bricks and mortar, but also to determine which of those facilities are the appropriate one for a particular alien to be detained at. So help me understand that. That first sentence, right, says shall arrange for, right, appropriate place. I mean, what we're talking about here is appropriate places of detention for aliens, right? That seems to suggest buildings and not where the alien is placed. You think it should not be read that way? It should be read to encompass both of those decisions? Yes, Your Honor. Appropriate places specifies authority to determine the appropriate place. It's a discretionary decision. But I'd like to move on to the merits. This Court should affirm the District Court's merits holdings for three reasons. First, plaintiffs don't allege that the government intentionally separated the adult plaintiffs from their children or that the government intentionally deprived the plaintiffs of family unity. Why don't they always intentionally? Every time they make a transfer, they intend to do it, don't they? They don't intentionally focus on family rights, but they clearly know when they're going to move somebody, it's going to affect family rights favorably or unfavorably. When I say family rights, a nearness to family, I don't know if it affects their rights so much. Your Honor, a transfer to another state may incidentally affect family unity interests, but that doesn't mean that the deprivation is intentional. And in this case, the complaint at most supports an inference that the government is ignoring family unity interests, not that ICE is intentionally separating parents from their children. In the briefs, appellants draw an analogy to the child separation cases in the Southern District of California, but that analogy is completely unsupported by the amended complaint, which doesn't allege any intentional separation of parents from children. On the second prong of a substantive due process claim, any deprivation of plaintiffs' family unity interests here was incidental to the government's legitimate interest in detaining the adult plaintiffs during their removal proceedings. The Supreme Court has recognized in the DeMoor case that detention during deportation proceedings is a constitutionally valid aspect of the deportation process. And the key point here is that to the extent that plaintiffs have a cognizable family unity interest, that interest was ruptured at the moment of arrest, at the moment of detention, not at the subsequent point when ICE transferred the adult plaintiffs to facilities in other states. His argument, though, it's aggravated. In other words, if he's arrested in Virginia and held in detention in Virginia, that's one big separation, of course. But his argument is that the transfer to Texas is another increased aggravation of the damage to that relationship because it's now harder to visit. Your Honor, as the District Court found and as cases like Aguilar have recognized, the Aguilar case from the First Circuit, the additional deprivation to the extent that one exists is incidental to the government's interest in detention. And it's really de minimis beyond the deprivation of family unity, assuming the plaintiffs have a right to that, that inheres in detention itself. The complaint at paragraph 15 alleges that Plaintiff Diaz-Morales, quote, lived in family unity with his children prior to his arrest by ICE. And that allegation is very telling. Arrest was the point when any family unity interest was ruptured, not the later point when ICE transferred the adult plaintiffs to Texas. The third prong of substantive due process is that a plaintiff must show that he's been deprived of a fundamental right. The Supreme Court has cautioned that fundamental rights must be defined narrowly. And although the Court has long recognized that parents have a fundamental right to make decisions concerning the care, custody, and control of their children, it has never recognized a broad right to family unity or a specific right of alien parents to be detained in the same state as their children. And as Your Honors noted during Appellant's argument, the state lines line that Appellants draw doesn't make much sense. In this very case, if the plaintiffs had been transferred to facilities in Maryland or in D.C., in the D.C. area, they would have been closer to their families possibly than if they had been transferred to a facility in western Virginia, which would have been within state lines. I'd also note that in the Golanosa case from 1986, this Court recognized that deportation of an alien parent does not violate any constitutional rights of the citizen children. And it would be strange to think that deportation doesn't pose any constitutional problem when that makes parent-child visitation essentially impossible, but that transfer to another state, which at least leaves open that possibility, does violate a constitutional right. Moving to the procedural due process claim, to state such a claim, a plaintiff must show that he has a protected liberty interest. Such an interest can arise from the Constitution itself or from a statute, regulation, or policy. And here plaintiffs rely only on the Constitution itself. They say that the due process clause gives them a fundamental right to family unity. But as I mentioned in the context of the substantive due process claim, the Supreme Court and this Court's precedent simply don't support that fundamental right or that asserted liberty interest. Appellants argue in the reply brief that the Court should apply, with respect to this question of whether they've asserted a liberty interest, the atypical and significant hardship standard, which comes from the Supreme Court's Wilkinson case. There, the Supreme Court held that a detention condition gives rise to a liberty interest if it imposes atypical and significant hardship in relation to the ordinary incidence of prison life. And even under that standard, plaintiffs can't show that they have a protected liberty interest. Transfer to another facility is not atypical or a significant hardship in relation to the ordinary incidence of immigration detention. As the complaint itself recognizes, interstate transfers are frequent and routine occurrences. Who does he allege has this right, the family or the detainee? Your Honor, I believe that they're asserting that both the detainee and his children have this right, have a right to have the parent detained in a facility that's in the same state as the child. And this atypical and significant hardship standard sets a very high bar. In cases like Bevarati, this court held that a transfer to an administrative segregation unit did not implicate a protected liberty interest, or that a detainee did not have a liberty interest in avoiding transfer to a segregated unit, even though the segregated cells were infested with vermin, smeared with human urine and feces, and flooded with water. So if those conditions were not sufficiently atypical to implicate a protected liberty interest, it's hard to imagine, even in the context of immigration detention, that a transfer to another state would be such an atypical and significant hardship so as to implicate a protected liberty interest. If there are no other questions, we'd ask the Court to affirm on the merits and reverse on jurisdiction. Thank you, Mr. Kerr. Mr. Glaber? Thank you, Your Honor. Very briefly, I want to make clear that we're not challenging the detention. We've talked a good deal about the detention itself. We're not challenging that or the government's interest in detention. But you say that as a prophylactic, but the truth of the matter is that when there is detention, the government makes the choice of making the arrest. The citizen doesn't have a hearing right to determine whether he's going to be detained, nor does he have a right to determine where he's going to be detained. The government, when he detains somebody, he can arrest them. He can put them basically anywhere that's an appropriate facility. So the question is, you would like to say, well, we're not challenging where he's initially placed. We're only challenging where he's transferred. But an individual's due process rights do not end at detention. There are still due process implications to changes that are made to confine them. Just a minute. We understand all these principles. You've got to argue the particularities. And the particularity is that you are claiming, I guess you're claiming, both the family and the detainee have a right to challenge a transfer? Yes, Your Honor, because the particularities here are that you have, in the context of the immigration system in particular, in contradistinction to the criminal system and any other context in the federal system, you have these no-notice transfers that lead to potentially thousands of miles of distance between the facility where the individual's being held, where they've been picked up, and where they've made a home for themselves. Everything you're alleging is inherent on the right of the state or the government to detain. When somebody detains somebody, they're removing them from society. They're removing their freedom of movement. And they're confining them such that it affects their family relations. And the fact that one aspect of that detention is the location of the detention. They make that determination. You're sort of isolating the post-detention transfer away from the family and saying the family and the detainee have a right to chime in on that. But there are still parameters around what happens within that system. Of course there are. We have Eighth Amendment problems. We have all kinds of punishment problems, discrimination problems. But we have never seen that I can remember a situation where the detainee says, I'm transferred and it hurts my family relationship and therefore is unconstitutional. Remember, Your Honor, these are civil detainees. They cannot be punished in this system. And, yes, in this relatively unique situation where you have a transfer for thousands of miles away from home and family, that transfer can give rise to a situation that implicates their family unity rights. Can I ask you one question? Sure. Going back to this, whether this is reviewable or not, sort of the 1231G bar, and I understand your argument in essence to be that this statute is about bricks and mortar, not where individuals are placed. Is that a fair description of what your argument is? And, therefore, this doesn't specify discretion about transfers? Yes, Your Honor. In fact, the very next sentence after the one that you were speaking of. I got it. I got that. So here's the question. I just want to frame the question. Okay. The question is, why hasn't that issue already been resolved by Gendarales Zembrana? You sort of cited a little bit, but the court there says that this provision, or the predecessor to this provision, which is 1252C, it's changed provisions, but that's the same language that it finds by citing that provision that the INS has the authority to determine the location of detention of an alien. So why hasn't the Fourth Circuit already found that that language is the authority to determine the location of detention? And so the only question we've got to determine is whether the word appropriate is sufficiently discretionary or not. I think the controlling case law here is actually the Supreme Court's decision in Kucana versus Holder that really made the distinction between the explicit discretionary authority in a statute versus an agency's discretion. I get that. It's got to be explicit. Yeah. But what I'm saying is the Fourth Circuit seems to have already said it is explicit. Right? So it said that this provision provides the authority to determine where an alien is housed and to transfer them. Right? And so why is that? Why doesn't that resolve the question of whether it is explicit? Your argument is that the Fourth Circuit, when they said that, they were relying on some implied authority, not what the statute actually says? I think that's right. I mean, it's sort of analogous to the First Circuit case, Al Shimori versus Gonzalez, which talks about the discretion of an immigration judge to grant a continuance. There's no question, nobody would deny, that an immigration judge can, in his or her discretion, grant a continuance. But nonetheless, the statute itself doesn't explicitly say that the immigration judge can grant a continuance, and that's the distinction here. But there is a sentence here that says that, or at least could be read to say, that the Attorney General, in what he finds to be appropriate, can place aliens. I think, as you alluded to earlier with my colleague, a better reading of that provision is the brick-and-mortar placement of facilities. And when read in context with the very next sentence that talks about what happens when a facility that is, quote-unquote, suitably located is unavailable, it would be so easy for the Congress to have put in there, well, then you can transfer, instead of you can allocate funds to build another facility, essentially, that is suitably located. So, in essence, like the previous Fourth Circuit case got it wrong. It's about bricks and mortars, not about the transfer. I think if you're reading the Fourth Circuit case to say that this provision explicitly defined the Attorney General's discretion to transfer, then I would say, yes, that case got it wrong. With that, Your Honor, I respectfully request that the Court reverse the District Court's decision. Thank you. We'll come down to Greek Council and proceed on the last case.
judges: Paul V. Niemeyer, Henry F. Floyd, Julius N. Richardson